The next case on this morning's docket is the case of Deborah Zimmerman v. Michael Schultheis and Effingham Obstetrics and Gynecology et al. We have Mr. Brett Holmes for the appellant and we have Mr. James Neville for Dr. Schultheis and Charles Hughes for Obstetrics and Gynecology. And I understand you've already divided your time at 10 each. So Mr. Holmes, you may begin your argument. May it please the Court and Counsel, my name is Brent Holmes. It's my privilege to represent Deborah Zimmerman in this case. I believe that where the trial court got off the track in this case and in which we are now in front of the appellate court, is that he was told that the plaintiff had to show that a better result would have occurred in the absence of the negatives in order to successfully establish a trial issue on proximate cause. But we know that Illinois Supreme Court, in the Holton case, and of course that was preceded by a series of appellate cases, has established a rule that for proximate cause, all that the plaintiff needs to establish is that the defendant's conduct increased the risk of harm to the patient or lessened the effectiveness of treatment. And in addition, I believe that Counsel succeeded in convincing the trial court that there had to be unequivocal evidence, certainty, with regard to the opinions that were expressed by the treating physicians as well as the retained experts. Or the plaintiff didn't have a triable case on the issue of proximate cause. But we know from reading the cases, the Holton case and the other cases, that the plaintiff does not need to present unequivocal or unqualified evidence of causation. And the plaintiff is also entitled to introduce circumstantial evidence from which the jury may infer other interconnected facts which reasonably follow. And this rule simply applies logic and common sense. Because Deborah's inability to show with certainty that the mass was at a size and not invading the organs, the structures that had to be removed by Dr. Winahan, the defendant shouldn't benefit from this because really it was Dr. Schultheis's negligence that was really a cause of that inability to present the evidence with absolute certainty. We know that on April 14, 2006, in his office, an ultrasound is conducted and it shows a mass, about a 4 by 4 centimeter mass, which he thought would be found in the uterus around the area of the ovaries. And so he goes in on April 24 and does a laparoscopy. And he doesn't find the mass. It's not there where he expected it to be. But if you go back to the ultrasound, it says this mass can only be seen in a transvaginal viewing, which would or should have suggested to him that maybe it was behind the uterus. It was retroperitoneal. So Deborah goes back on May the 8th for a follow-up visit. He does no imaging studies. He hasn't found a mass that the ultrasound told him should have been there. One would have expected him to do follow-up imaging studies on May the 8th. Where is this mass? How come it wasn't there in the uterus? Where is it located? He didn't do any of that. And, of course, that was to Deborah's great and tragic harm as a result of that because we know that about four months later, August 25th, as a result of excruciating pain, she winds up in the emergency room at St. Anthony's Memorial Hospital. CT scan is taken, and this mass has now grown to 6 by 6 centimeters and now is invading other structures. Dr. Gore's supplemental affidavit is consistent with his deposition testimony and with his supplemental report after viewing the ultrasound images of Dr. Schollheis that he took on April the 14th of 2006. And at the very least, his opinions in his supplemental affidavit are a logical corollary to his opinions. Even in his deposition, he said, well, you know, in January this was a small and in February this was a small, relatively small mass. And by the report of Dr. Schollheis of the ultrasound in the middle of April, it was still a small mass. It wasn't invading these other structures. And we know by looking at the CT on August 25th of 2006, it had now, because it hadn't been addressed, identified, and removed, it was now involving other structures. It was now involving the psoas muscle, the left ureter, the adjacent bowel, the left adnexa, and the left ovary. So this was the devastating result of the untreated tumor mass from April of 2006. And beyond, there's no surprise to the defendants with regard to that opinion. There's no prejudice to them. Dr. Gore, who's a radiologist with a concentration or an interest in oncology, says that in April you've got a mass that's not invading these other structures, and in August you have it invading these structures. Now, when a doctor goes in and does surgery to remove a tumor, he removes the tumor. He doesn't remove healthy tissue. One can obviously infer from Dr. Gore's deposition testimony and certainly from his report that these structures were still healthy. They were not being affected by this cancer in April. And unfortunately, by late August, they were. Approximate cause clearly has been established there. And further, Dr. Gore's opinions are based on the imaging studies. The defendants have those imaging studies from January, February. Dr. Scholhaus took the imaging study ultrasound in April. He's got the CT of August. The imaging studies either confirm Dr. Gore's opinions are correct or they don't. It's basically that simple. As Dr. Gore pointed out, the April ultrasound showed that the tumor was still small. It was still a small, basically, area that did not involve any of these other structures that I mentioned. Now, the defendants convinced the trial judge that the Smith v. Murphy case was right on point and that, therefore, Dr. Gore's affidavit should be stricken. There is nothing even remotely similar to the Smith v. Murphy case other than the fact that the court, in this case, erroneously struck Dr. Gore's affidavit in response to the motion for summary judgment. In the Smith v. Murphy case, which we discussed extensively in our brief, the plaintiff's retained expert, when his deposition was taken, he completely recanted his opinion. He basically said, well, by the end of the deposition, no, I don't find any deviation from the standard of the case. So then, shortly before trial, when faced with a motion for summary judgment, the plaintiff's counsel comes up with an unsigned proposed affidavit of a previously undisclosed retained expert and then says, well, hey, consider this, and this should get me past summary judgment. That is not even remotely close on the facts or the circumstances to our case. As we pointed out, Rule 213 should be used as a shield, not a sword. And in this case, the defendant successfully used this as a sword to bar testimony that was clearly relevant, appropriate, and not prejudicial to them, and no surprise. One court in a case, and I've always kept it in my mind, an appellate court justice stated an opinion that the billing of a case by the plaintiff consists of using individual groups to bill the role. Not one witness is going to tell the whole story. And again, the defendants, I think, misled the trial court, I think, by convincing the trial court, well, where is this one witness who puts it all together and says all these issues, you know, they don't have it. Well, you don't need to have all of it. If you look at the opinions of Dr. D, Dr. Al-Zahavi, Dr. Linehan, even, and Dr. Dubow, and certainly Dr. Gore, these opinions are all admissible. And what the defendants argue about really goes to the weight of these opinions rather than their admissibility. Dr. D, the treating oncologist, yes, he said, I can't tell you for sure whether there would have been any difference in the outcome, but as we pointed out, in the cases, that's not required. But what does Dr. D say as his opinions and what he knows about Debra's condition? He says at 1060 and 61, I think we know that it was smaller back in April or February or January. So I think it would be very, very easy to assume that the surgery that Dr. Linehan would have done earlier would have been a lot less surgery. It probably would not have involved removing several structures, including the kidney, which I think in retrospect now is causing a lot of problems now since she only has one kidney left. Dr. Al-Zahavi, the necrologist, the kidney expert for her, testified in his deposition, and again, this goes across the cause. He says, well, why is she at the cusp of having to go up on a dialysis? He says, well, at the top of my differential list, the diagnosis is she's only got one kidney. Well, why is that the case that with one kidney now you've got reduced kidney function to the point where she needs to go on dialysis? He says, well, because she probably has developed FSGS. And what is FSGS? This is a condition that can develop in a patient who has had one kidney removed. In other words, the fact that you've had one kidney removed can produce FSGS in the patient so that in the remaining kidney, that condition causes the remaining kidney function to go down, down, down, down, down until she needs dialysis for the rest of her life. Dr. Linehan also in his testimony pointed out that he could assume that the mass in April was smaller and that it was the same mass that he saw and removed. And, of course, by the time of his surgery, it had grown much larger. Dr. Deboe, given his opinion with regard to the issue of proximate cause. Again, these opinions are admissible, and the arguments of the defense go to the weight, not to the admissibility of those opinions. Deborah lost the opportunity to undergo treatment that could have been more effective if given earlier. She wasn't required to prove that such treatment would have been effective, and those cases, the lost chance case beginning with Northern Trust back in First District case in 86, then the Chambers case, another First District case in 87, the court there said that the plaintiff's expert was not required to show a better outcome would have resulted than the Hodgkin case, a First District case again in 1995. The plaintiff's expert did not state whether the delay in notification made an actual difference, but it could have made a difference, and that was sufficient on the issue of proximate cause. And then, of course, the Illinois Supreme Court case in 1997, where the court has adopted the rule that now we are operating under the malpractice, if the malpractice lessened the effectiveness of the treatment or increased the risk of an unfavorable outcome, then the plaintiff has submitted sufficient evidence on the issue of proximate cause. And the most recent or a more recent case is the Third District case from 2014, the Heminger case, again applying the rule in full. So the trial court committed irreversible error in granting the defendant's supplemental paragraphs 23, 24, and 25 of the motions eliminated, striking the opinions of Dr. D, Dr. Al-Zahabi, and the opinion contained in Dr. DuBose's evidence deposition, and also striking the affidavit of Dr. Richard Gore, as we've already discussed. With regard to the reversal of the judge's decision about the evidence deposition of Dr. DuBose, at first he overruled the defendant's objection, and then upon a re-hearing decided that, yes, he was going to strike that testimony. We believe that under the Moore v. Jewell key case that because there was no objection made at the time of the deposition that the objection was waived. Even absent a waiver, the testimony is an elaboration or a logical extension of Dr. DuBose's opinions that have been expressed in this case. As we've pointed out, certainly there is no prejudice to the defendant with regard to the opinions of Dr. DuBose that based upon the ultrasound and the small size of the tumor in April, compared to what it had grown to by the end of August, that Deborah could have had a better outcome with regard to effective and timely treatment by Dr. Schollheis. And when I say there's no prejudice to the defendant, well, we know that his discovery deposition was taken on June 14, 2011. His evidence deposition was taken on July 3, 2012, and the defense don't get around to filing their supplemental motion of limine until January 8 of 2015. They had the evidence deposition in the can for all that period of time, several years, but then, of course, waited until the time they could cause maximum prejudice to the plaintiff using Rule 213 or the argument of 213 as a sword, not a shield. And as we pointed out, what is the point to this? Because when the case is tried, they already know what the opinion is. He expressed it in his evidence deposition July 3, 2012. They have plenty of time to meet that evidence. It was an extension of evidence. And so what prevents the plaintiff from calling Dr. DeBoe live at trial? And he says the same exact thing he said in his evidence deposition. There is no prejudice at all to the defendants with regard to that. And striking that portion of his evidence deposition is really of no discernible benefit to the defendant but will entail a whole lot of additional costs to Deborah in bringing Dr. DeBoe live to trial. This testimony also should have been considered on the motion for summary judgment. But tactically, it was interesting because the defendants go after these opinions and guys and motions in limine, get them struck, and then say, okay, Judge, let's consider the motion for summary judgment, and say, well, now you can't consider any of the sentiments. Come on. The motion for summary judgment is to consider whether or not there is a tribal issue of fact, not how should we decide the case and usurp the province of the jury in connection with the issue of proximate cause. And when we argued the case in front of the trial court, and it's in the record at C-885, we cited the Arm v. Fritcher case, a Fourth District case. And I think it's instructive because, again, you build this wall of individual bricks, and each individual bit of testimony assists the jury in deciding and allowing them to decide all the issues of the case, negligence, proximate cause, damages. And in Hon, the treating, it was a motor vehicle case, I recall, the treating orthopedic surgeon, Dr. Lack, testified in his deposition that, yes, the injuries to the plaintiff's leg or hip, could or might have resulted in the subsequent care and treatment of the injuries that he received. Well, in cross-examination, the defense counsel basically got him to say, well, I think it would just be purely speculative. The Fourth District, and so, directed Burdington, Fourth District appellate court, said, well, wait a minute, wait a minute. He gave that testimony that could or might on direct examination. He said on cross, it's purely speculation. Both of these are in the record. It's for the jury to decide how much weight to give what he said in his direct, how much weight to give what he said in his cross-examination. Not for the court to simply say, well, we're going to decide that for the jury and throw this case out. This evidence that we have cumulatively clear allows this case to go to the jury, and we respectfully request that the court reverse the decisions and the rulings of the trial judge and remand it for trial. Thank you. Thank you, Mr. Holmes. You'll have the opportunity to rebut. Mr. Neville. Good morning, Your Honor. Good morning. Mr. Hughes and I have agreed to split the argument 10-10. I will be addressing the evidentiary rulings of the trial judge. As outlined in the joint appellee's brief arguments one and three, Mr. Hughes will address the summary judgment issues. The evidentiary issues consist of the court's ruling in striking the supplemental affidavit of Dr. Gore filed well after the discovery time had ended and in opposition to a motion for summary judgment. And the evidence deposition of ruling by the court as to Dr. Dubow in both instances the court was making a determination that these were in violation of Supreme Court Rule 213. The standard of review for this court is an abuse of discretion on the evidentiary rulings and the violations of Supreme Court Rule 213. As this court is well aware because there have been many decisions that this court has issued on Supreme Court Rule 213, as has the Supreme Court, Supreme Court Rule 213 is mandatory. It's not a suggestion. It is mandatory for all the parties. Parties must disclose the subject matter, conclusions, opinions, qualifications, basis of opinions of any witness who will be offering opinion with testimony at trial. The rule requires that the parties timely supplement any of these opinions after a written disclosure or deposition. Supreme Court Rule 213G states that information disclosed in the Rule 213 written disclosures as well as a discovery deposition limit the testimony that can be given by a witness upon direct examination at trial. And that's kind of an important point here because as it pertains to Dr. Dubow, the new testimony that was brought out in his evidence deposition was brought out on direct examination by the plaintiff's counsel. Obviously he knew and didn't advise the defense of the new opinions. The purpose of 213, as the court is aware, is to avoid surprise and gamesmanship. You know, the counsel referenced building blocks and building the case, and that's true, and that's true for the defense too. We use testimony as building blocks, but we have to do it within the rules. Supreme Court Rule 213 is, particularly in a malpractice case, a critical rule for avoiding unfair surprise and gamesmanship. The trial court did not abuse its discretion in this case. The affidavit of Dr. Gore added new testimony, added new opinions not previously disclosed. In this case there were four defendants, two radiologists, Dr. Schulteis, who I represent, and his professional corporation. Dr. Gore and the two other defendants in the case were radiologists. Dr. Gore's primary focus in the disclosure and in his discovery deposition was in criticizing the radiology defendants in the case. He clearly in his deposition said there was misinterpretation of three studies done in January and February. We have a CT scan by one radiologist which was reported negative, no mass. An ultrasound done a week or two later by a different radiologist that showed a mass, a 4 by 4 centimeter mass. And then a CT scan and a barium enema study interpreted by the very same radiologist that showed no mass. And that becomes significant later on. In his discovery deposition and in the disclosure, Dr. Gore was critical of the interpretations of those radiologists and said from January and February up until August when the tumor was diagnosed there was significant change and involvement of other structures. And if diagnosed in January, February, would not have involved those other structures, that's where he ended. He did not even comment about what took place in April when Dr. Schultes did an ultrasound and found a mass and then did a laparoscopy and then didn't find a mass. And that's because of its retroperitoneal location. Couldn't see it in ultrasound. I mean during laparoscopy. So the defense files a motion for summary judgment and for the first time in response, plaintiff supplements with an affidavit from Dr. Gore where he says now that the delay in diagnosis from April when Dr. Schultes does his ultrasound until August four months later resulted in the spread of the cancer to the psoas muscle, the left adnexa, left ovary, colon, and other adjacent structures. And then a second opinion that the delay resulted in the removal of those structures and the apparent inability to remove all the cancer. Can you tell me why that's not a corollary opinion? It's not a corollary because he had no such opinions. His focus was solely on January. There was no mention of April. In fact, he hadn't even seen at the time of his deposition the ultrasound performed by Dr. Schultes. That was provided to him after his deposition. And he supplemented, plaintiff did supplement with his opinion that it was the same mass in August when seen on CT scan as was seen in April on ultrasound. That's where it ended. No opinions that there was, because of this delay, there was spread to other areas or that the surgery would be any different. That's all new in an affidavit filed after disclosure cut off and in response to the motion for summary judgment. And with regard to Dr. Bowe, it's similar. His discovery deposition was taken. His written disclosure was provided. I took his discovery deposition. And he offered no opinions about proximate causation or damages. He was standard of care. He's an OBGYN, as is Dr. Schultes. The best he would say in his discovery deposition in response to Mr. Holmes' question is that in a general sense, with cancer, the earlier, the better. But he went on to say in that deposition that he admitted he did not have the expertise to testify about the metastatic potential of plaintiff's cancer, and he agreed that there are circumstances of cancer where a diagnosis of a tumor earlier may not result in a change of outcome. So, no opinions in this case whether it proximately caused harm or the damages caused from it. Plaintiff notices up his evidence deposition, and in direct examination, he adds the opinion that the delay in diagnosis from April to August resulted in a more complex surgery that had to be done with less chance of avoiding damage to the pelvic organs. Brand new opinion. Now we're talking about proximate causation and damages when he previously had no such opinions. And this was in direct examination. It could have been supplemented. That would have given us an opportunity to prepare for his evidence deposition. That would have given us an opportunity to have experts address that opinion. But the discovery was already cut off at that point. Counsel suggests that there's no harm to the defense. Of course there is. That is an evidence deposition that would otherwise be read at trial as if that's the in-court testimony. If he came to court and testified live and offered that same testimony, we would make the same objections at trial that it was a Rule 213 violation because the time for discovery had long been closed. So we believe the court exercised its discretion. In its order, it said it read all of the depositions, considered all of the arguments, and it entered its ruling that this was a 213 violation by the plaintiff and struck that testimony. With regard to the testimony of Dr. D, he is the plaintiff's treating mycologist, and Dr. Al Zahavi, he's the plaintiff's treating nephrologist. Dr. D, in his discovery deposition, said he could not give an opinion whether the outcome would have been any different if the patient had been diagnosed in April than she was in August. He testified that with this cancer, the prognosis was poor regardless when diagnosed, and he would be speculating whether, of course, it would have been any different. So that was the basis of our motion to eliminate regarding any testimony suggesting that he would be offering opinions regarding proximate causation or damages. Dr. Al Zahavi is the treating nephrologist. He, too, never gave the opinion that the delay caused, that the delay in diagnosis resulted in the necessity of the nephrectomy or the removal of one kidney. The plaintiff had for a while, there was concern about the functioning of her remaining kidney. The kidney was removed at the time of surgery along with the cancer. And there was some concerns as to whether or not her remaining kidney was functioning properly. And Dr. Al Zahavi diagnosed a condition known as FSGS, as counsel mentioned, focal segmental glomerulosclerosis. And he also diagnosed another condition known as Fanconi syndrome. And he had no opinions as to the cause of that and whether the FSGS was the cause of the problems. In other words, he offered no opinions at all. So we're back to plaintiffs retaining opinion witnesses. And in each instance, opinions were offered after the close of discovery and were prejudicial to the defendants. In conclusion, we believe that the trial court, Judge McKinney, acted reasonably and reviewed everything and made a well-reasoned decision. We do not believe there was any abuse of discretion in his rule. He considered it carefully and ruled appropriately. Thank you. Thank you. Mr. Hughes. Thank you, Your Honor. Good morning. Good morning. May it please the Court. Counsel. The suggestion is made that somehow the defense imposed its will on the trial court. That's not what happened. The trial court heard argument by both parties, well-presented by both parties. And made a decision, which is what the trial court required to do. As it turns out, it was a totally appropriate decision. The issue with respect to the summary judgment relates virtually exclusively to the question of causation. And I think the Court will recognize, because of the number of cases that have been cited, that this is a controversial issue, would be the simple way to say it. But the reality is that the issue presented to the trial court in this case was whether or not there was evidence at the close of discovery from which a jury could properly determine that a delay, if negligent, caused injury. And in this case, injury has a rather specific definition. But evidence in that injury would be defined as somehow less effective treatment. In other words, evidence of less effective treatment or evidence of an increased risk of an unfavorable outcome. Those are from the Vorotsky Court case. There's any number of definitions, but essentially that is the injury we're dealing with here. Now, evidence is speculative for this purpose. Unless the increased risk of injury is proven with a reasonable degree of medical certainty and is proximately caused by the defendant's negligence. That's the Foley case. It's old. It's good law. It still stands for the same proposition. Here's an important fact that sometimes gets omitted. We know for a fact that this patient had cancer. We know for a fact, based on Dr. Gore's testimony, if nothing else, that the cancer was present in January. And we know for a fact, based on all of the testimony, that she was going to have to undergo surgery. Period. There was no other curative mechanism. So the question we have, is there any change in evidence, credible evidence, not speculative evidence, of the fact that there was a change in some way in increased risk of harm or an increased risk of unfavorable outcome. The evidence, and I guess the question is, what is the evidence that the interval from April 16th or 14th, I don't recall specifically, to August, that is a period of four months in the entire history of this cancer, made this treatment less effective or increased the risk of an unfavorable outcome. It is a four-month interval. The plaintiff's experts suggest in their testimony during the course of the discovery phase, the platitude, and it is exactly that, that earlier is better than later. You know, nobody disputes that. That's simply not disputable. But it also leaves open to the jury, and in fact not only leaves open, but invites the jury, if they're permitted to hear that testimony, to speculate on when is earlier. As an example, if the discovery is made the next day, is that sufficient? Is it still early enough? And then the question becomes one of how does the treatment change? We're very familiar with an example, lung cancer cases, and in those cases it's very common to hear testimony that diagnosis in January wouldn't have been any different and the outcome wouldn't have been any different than it would have been in April, as an example. In that case, an eight-month interval, because the fact is it's already metastatic. That's the testimony that's absent here. That is the testimony that is missing. I'm going to address that very specifically in just a moment. No one has given testimony that, in fact, is not speculative, that the surgery was somehow increased or more complicated as a result of this delay. The treating physicians declined to offer any opinions in this regard. In fact, the more they know, the more they decline to offer the opinions because they recognize this is simply too complex an issue to base on these questions. And they simply, too many variables, and they back away from any opinions whatsoever. They have too little information, which is the risk of giving this to the jury in the condition in which it was presented at the close of discovery. Again, the jury would have been left to speculate on whether there was an injury and the degree or extent of injury. There are two cases that are cited and argued extensively, both in the summary judgment and also in the appellate briefs, and I'd like to address those. I think they're rather illustrative of the principles we're talking about here. One is Reed v. Jackson Park Hospital. The second is the Heminger case. These cases illustrate what is required to reach a jury on the issue of causation. And this is really pretty simple, and to use a phrase I heard earlier in the earlier argument, it's black-letter law. I don't hear a lot of black-letter law anymore, but this is, because the measures that need to be made, the measures that need to be taken, are really pretty simple. What is the condition before? What is the condition after? That is what a jury has to base their decision on. It is in the case of Reed that ability to make the condition before and condition after was absent, and that is the basis for the appellate court's decision in that case, because what they ultimately decided was that the expert, whose testimony was being proper, did not have a basis to talk about the condition at the time of initial presentation and therefore had no foundation for what the potential for treatment was. That's the Reed case. Now, in the Heminger case, also cited by Plank, what you have is a case where the patient presented on a specific day and had certain symptoms. The plaintiff expert in that case came forward and said, and this is very important in terms of the outcome, that on that presentation, at the time of that presentation, this patient had a cancer, a ovarian cancer, which was either a Stage 1 or a Stage 2B, very specific based on the findings and the testimony of the treating physician defendant. That expert went on to note that at the time of ultimate diagnosis and surgery, this was a 3B. That expert then further went on and cited two well-acknowledged tables with respect to the survivability or outcome or prognosis of these surgeries and was able to opine that if this had been diagnosed when initially presented, it was a 63 to 58 percent likelihood of survival, but as a 3B, when it was actually discovered, the likelihood of survival was 32 percent. Very specific, very clear. And my point in this is whatever... You can finish your thought, but your time is up. Okay, and I apologize. These cases are highly illustrative of the principle that you have to have a beginning point and an end point, and you have to have credible efforts from which to make those determinations. None is present in this case. Thank you. Thank you, Mr. Hughes. Mr. Holmes, I question you of rebuttal. Thank you. Counsel is critical of Dr. Gore's affidavit, but when you distill it down, Dr. Gore expressed his opinions or his opinions with a logical corollary of the opinions he had expressed. When counsel points out that he had criticisms of the radiologist, of course he did. He's a radiologist. He also has an emphasis in oncology. With regard to the opinions of whoever was dropping the ball of Deborah Zimmerman, he also had to express an opinion with regard to proximate cause. His opinion on proximate cause goes to the failure of the radiologist, the failure of Dr. Schultheis, the failure to treat her in a timely manner at a time when it could have made a difference. Those opinions were in the record. He pointed out in his discovery deposition that even in April, when he looked at the ultrasound report, and this is the description of Dr. Schultheis of the ultrasound, this was a relatively small, confined mass. It wasn't invading other structures. Yes, after the deposition, he asked to look and to get from Dr. Schultheis the actual ultrasound images, and he looked at them, and yes, it was exactly what Dr. Schultheis said. They weren't invading the other structures, and he points that out in his supplemental report that was provided. There is no Rule 213 violation, and I noticed pointedly counsel didn't get up and go through the six factors that the court of Smith says you have to do this in determining whether or not, even if you are to do the claim, there's a Rule 213 violation, whether or not that violation warrants the striking of the testimony, and clearly here, it does not. Absolutely not. There is no Rule 213 violation. With regard to Dr. DeBow, they suggest that because Dr. DeBow says he's not going to, and it's beyond his area of expertise to talk about what would be the exponential cell growth of this type of tumor. In other words, how long does it take for the cells to double in size or for cells to now have four times as many cells? He's not a molecular biologist, so he's not going to express opinions in that sense, but he says that even in his discovery deposition, and I've said this before in a general sense, the earlier you make a diagnosis of cancer, the better the likely prognosis will be. And then, of course, he had expressed those opinions, and we believe that they were appropriately expressed in his evidence deposition. One thing that I want to point out that counsel, Mr. Hughes, just now talked about a case in which there was stage 2B in cancer or stage 2C. This is not a staging case. This is not a staging case. This is not like leukemia, either, with regard to the treatment being radiation or chemotherapy. This is a situation where you have a discrete tumor. You go in and you remove the tumor. That is the effective treatment, and she was denied the effectiveness or wasn't the effectiveness of that tumor because in April, more likely than not, you would have removed that tumor when it was localized. It had not invaded the psoas muscle. She wouldn't have had the loss of the left ureter, which meant that you also then had to remove the left kidney. She would not have had to have the adjacent bowel, which means she then had a prostate. And he couldn't remove all the cancer by that time because some of it was against the iliac artery and the psoas muscles, so he had to leave some cancer in there. And within a month or so, it had returned, and so he had to go in and do additional surgery and to have radiation and chemotherapy. She would have been in far better condition had he been able to, or some surgeon, remove that in April when it had not advanced and started touching these other structures, when it was not in that advanced growth stage. Yes, there is plenty of evidence for the jury to decide that had she received the treatment she should have gotten to meet the standard of care in April of 2010 by Dr. Schultheis, that she would have, more probably true than not, had a much better outcome. Thank you, gentlemen, all, for your briefs and your oral arguments, and we'll take them at our under advisement and under ruling in due course. We're going to stay in a brief recess. All rise.